# United States Court of Appeals
## For the First Circuit

---

No. 04-1546

CHELSEA SMITH,

Plaintiff, Appellant,

v.

FITCHBURG PUBLIC SCHOOLS,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Leval,* Senior Circuit Judge.

---

Theodore M. Hess-Mahan, with whom Shapiro Haber & Urmy LLP, Julia K. Landau, and Massachusetts Advocates for Children, were on brief, for appellant.

Doris R. MacKenzie Ehrens, with whom Mary L. Gallant, and Murphy, Hesse, Toomey & Lehane, LLP, were on brief, for appellee.

---

March 22, 2005

---

*Of the Second Circuit Court of Appeals, sitting by designation.

**STAHL**, **Senior Circuit Judge**. Plaintiff-Appellant Chelsea Smith ("Chelsea"), by and through her parents, Linda and Deane Smith ("Chelsea's Parents"),[1] initiated a proceeding before the Bureau of Special Education Appeals ("BSEA"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., against the Fitchburg Public Schools ("Fitchburg") seeking home and hospital special education services. After a series of pre-hearing orders and ultimately a private settlement, Chelsea received all of the relief sought. Chelsea's Parents subsequently commenced this action in the district court to recover attorneys' fees and expenses as a prevailing party pursuant to 20 U.S.C. § 1415(i)(3), which provides for an award of attorneys' fees to parents of a student with a disability who is the "prevailing party" in an action or proceeding brought under the IDEA. The district court granted summary judgment in favor of Fitchburg on the ground that Chelsea was not a "prevailing party" within the meaning of Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598 (2001). We affirm.

[1]Under the IDEA, it is the aggrieved child's parents who may initiate a due process hearing under 20 U.S.C. § 1415(f), and who may seek attorneys' fees as prevailing parties in such a hearing under 20 U.S.C. § 1415(i)(3). For convenience, however, we use "Chelsea" and "Chelsea's Parents" interchangeably throughout the opinion.

## I. BACKGROUND

The material facts in this case are undisputed. At the time these proceedings were initiated, Chelsea was a thirteen-year-old girl living with her parents in Fitchburg, Massachusetts and enrolled as a student at St. Joseph's School. When Chelsea was two, she was diagnosed with liver cancer and underwent extensive treatment including chemotherapy, radiation, and surgery. As a result of that treatment, she suffers from partial hearing loss and ongoing gastrointestinal, respiratory, and other serious impairments. She depends on hearing aids and classroom assistance because of her disability.

Chelsea attended the Fitchburg public schools from 1993 to 1997, during which time Fitchburg provided special education services consisting of speech and language therapy. In 1997, Chelsea's Parents withdrew her from the public school and enrolled her in St. Joseph's School, a non-public, parochial school located in Fitchburg. Fitchburg continued to provide Chelsea with special education services at St. Joseph's.

In early 2001, Chelsea became ill due to complications from her earlier treatment, requiring multiple prolonged hospitalizations and surgeries. As a result, Chelsea missed a significant amount of school. In June 2001, Chelsea was hospitalized again, and, in August 2001, when it became clear that Chelsea would be absent from school for an extended period of time,

her parents asked that the principal of St. Joseph's contact Fitchburg's special education department to request special education services for Chelsea while she was hospitalized. Fitchburg informed the principal that it was not required to provide such services because Chelsea was a regular student enrolled in a non-public school.

In September 2001, Chelsea's Parents hired a private tutor to provide Chelsea with educational services while she was in the hospital, and directed that the bills be sent directly to Fitchburg. Fitchburg refused to pay these bills.

As a result, on November 6, 2001, Chelsea's Parents filed a request for an administrative hearing before the BSEA seeking an order requiring Fitchburg to: (1) pay for Chelsea's tutoring at home and in the hospital; (2) convene an IEP meeting to address Chelsea's special education needs;[2] and (3) implement the resulting

---

[2]The terms "TEAM meeting" and "IEP meeting" are used interchangeably. Both terms refer to a meeting of a disabled child's "IEP Team" which consists of "(i) the parents of a child with a disability; (ii) at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment); (iii) at least one special education teacher . . . ; (iv) a representative of the local educational agency . . . ; (v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi); (vi) . . . other individuals who have knowledge or special expertise regarding the child . . . ; and (vii) whenever appropriate, the child with a disability." 20 U.S.C. § 1414(d)(1)(B).

IEP.[3] Chelsea was subsequently discharged from the hospital on November 11, 2001, although her medical condition prevented her from returning to school at that time. Because Fitchburg continued to refuse to provide special educational services for Chelsea, Chelsea's Parents arranged for Chelsea to be tutored at home.

On December 4, 2001, the BSEA Hearing Officer initiated a conference call with the parties, and at that time, Fitchburg orally agreed to convene a TEAM meeting on December 12, 2001 to evaluate Chelsea's special education needs. On December 12, 2001, because Fitchburg had not convened the TEAM meeting, Chelsea filed a motion requesting that the BSEA Hearing Officer order Fitchburg to convene the meeting. Fitchburg did not oppose the motion, and on December 20, 2001, the BSEA Hearing Officer issued a ruling granting Chelsea's motion, stating that "Fitchburg will use its best efforts to convene the TEAM on January 4, 2002 but in no event will the TEAM be convened any later than <u>January 11, 2002</u>." On January 10, 2002, Fitchburg's counsel informed Chelsea's Parents that the TEAM meeting would take place the next day. Due to the

---

[3]IEP is the abbreviation for an "Individualized Education Program," which is defined in the IDEA as "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes-(i) a statement of the child's present levels of educational performance . . .; (ii) a statement of measurable annual goals . . .; (iii) a statement of the special education and related services and supplementary aids and services to be provided to the child . . .; [and] (vi) the projected date for the beginning of the services . . . and the anticipated frequency, location, and duration of those services . . . ." 20 U.S.C. § 1414(d)(1)(A).

short notice and conflicts with Chelsea's medical appointments, the TEAM meeting was rescheduled and eventually convened on January 18, 2002.

As a result of the TEAM meeting, Fitchburg determined that Chelsea was entitled to receive "home/hospital education services" despite her enrollment in a private school. Soon thereafter, the parties, under the guidance of the BSEA Hearing Officer, commenced negotiations for a settlement agreement to include home/hospital tutoring, reimbursement for prior tutoring expenses, execution of the IEP, and payment of attorneys' fees. Following a BSEA Hearing Officer-initiated conference call, the Hearing Officer issued an Order, noting that the "[p]arties reported that they were discussing settlement," and confirming that "School Counsel will send a written proposal for settlement by March 25, 2002 at 12:00 p.m." The Hearing Officer also scheduled a follow-up conference call for March 25, 2002 at 3:00 p.m.

Fitchburg sent a draft settlement agreement to Chelsea on March 21, 2002. After the March 25, 2002 conference call, the BSEA Hearing Officer issued an Order to Show Cause why the case should not be dismissed in light of the parties' impending settlement. At that time, however, Fitchburg had not yet provided Chelsea's Parents with the proposed IEP[4] and a signed copy of the settlement

[4]The record shows that Chelsea's Parents were provided with a handwritten draft of the IEP at the conclusion of the TEAM meeting on January 18, 2002, however, at that time, Fitchburg indicated

agreement. Accordingly, Chelsea's counsel responded to the show cause order, requesting that the case remain active until Chelsea received the IEP and both parties had executed the settlement agreement. On April 29, 2002, after another conference call, the BSEA Hearing Officer ordered Fitchburg to send Chelsea's Parents the IEP by Thursday, May 9, 2002 at 3:00 p.m.[5] and scheduled a conference call for Friday, May 10, 2002 to further discuss the pending settlement. That order stated that Fitchburg's failure to send the IEP by May 10, 2002 would result in sanctions. Fitchburg faxed the IEP on May 9, 2002, but did not forward a signed copy of the settlement agreement. During the May 10, 2002 conference call, Fitchburg said that it would send Chelsea's Parents a copy of the settlement agreement, and would review Chelsea's Parents' proposed changes to the IEP. Fitchburg's promises were again memorialized in an Order issued by the BSEA Hearing Officer that same day, and a follow-up conference call was scheduled for May 21, 2002. Chelsea's Parents forwarded the proposed changes to the IEP on May 14, 2002, and on May 20, 2002, sent a letter to Fitchburg's counsel noting that they had not yet heard back from Fitchburg about the

---

that it would have to "clean up" the IEP, and Fitcbhurg's counsel described this "cleaning up" as "correct[ing] grammar, punctuation, etc. and put[ting] the IEP into typewritten form."

[5]The actual order says "Thursday, May 2," although the parties do not seem to dispute that the IEP was due on May 9, the day before the conference call scheduled for May 10.

proposed changes, despite the fact that a conference call was scheduled for the next day.

On May 23, 2002, the BSEA Hearing Officer issued a second ruling, this time ordering, under threat of sanctions, that Fitchburg respond to Chelsea's Parents' proposed changes to the IEP no later than May 31, 2002. The ruling also set up a conference call for June 3, 2002.

During the June 3, 2002 conference call, the parties discussed and agreed upon several proposed changes to the IEP. In addition, the parties acknowledged that it was time to convene another TEAM meeting to discuss services for Chelsea during the summer months. In an order memorializing the conference call, the BSEA Hearing Officer stated that Fitchburg would send Chelsea's Parents a copy of the settlement agreement and would execute the changes to the IEP agreed upon in the conference call. The order also stated that by the next conference call, scheduled for June 11, 2002, a date for the TEAM to reconvene would be set.

On June 7, 2002, Fitchburg executed the settlement agreement and forwarded it to Chelsea's counsel. Fitchburg did not, however, send an executed IEP reflecting the changes agreed upon during the June 3, 2002 conference call. On June 10, 2002, Chelsea's counsel sent Fitchburg a letter stating that Chelsea had not received the signed IEP. On June 19, 2002, Chelsea's counsel sent the BSEA Hearing Officer a letter stating that Chelsea still

had not received the signed IEP. On June 26, 2002, Chelsea's counsel sent yet another letter to the BSEA Hearing Officer stating Chelsea still had not received the signed IEP, and requesting a Hearing Officer-initiated conference call to address Fitchburg's failure to provide a signed copy of the IEP.

On July 2, 2002, the BSEA Hearing Officer issued an order requiring Fitchburg to "execute a signed IEP no later than July 5, 2002." The order stated that Fitchburg's failure to do so might result in sanctions. On July 16, 2002, Fitchburg sent Chelsea's Parents a signed IEP, and Chelsea's Parents executed the settlement agreement that same day. The settlement agreement provided, inter alia, that (1) Chelsea is a child in need of special education services; (2) Fitchburg would reimburse Chelsea's Parents for Chelsea's home/hospital tutoring expenses; (3) Chelsea's Parents would withdraw with prejudice their request for a hearing before the BSEA; (4) the settlement agreement did not constitute an admission that the services previously proposed or implemented for Chelsea were in any way inappropriate or inadequate; and (5) the Agreement did not release the claims of Chelsea's Parents against Fitchburg for payment of their legal fees in connection with this matter and that the Agreement did not, in any way, affect the Parents' right to seek payment of their legal fees from Fitchburg in an appropriate forum.

After signing the settlement agreement, Chelsea's Parents withdrew their request for a hearing. The case was dismissed on July 17, 2002. On August 15, 2002, Chelsea's Parents brought this action in the District Court of Massachusetts, alleging that Chelsea was a "prevailing party" in a proceeding under the IDEA, and thus was entitled to attorneys' fees, expenses and costs pursuant to 20 U.S.C. § 1415(i)(3)(B). Chelsea's Parents also claimed they were entitled to fees because 20 U.S.C. § 1415(i)(3)(D)(ii) provides that attorneys' fees may be awarded if an IEP meeting is "convened as a result of an administrative proceeding." The parties filed cross-motions for summary judgment. The district court allowed Fitchburg's motion for summary judgment, holding that "[t]he ultimate settlement (rather than adjudication) of this case compels the denial of prevailing party status to [Chelsea]." Chelsea's motion for summary judgment was denied. Chelsea's Parents filed this timely appeal.

## II. DISCUSSION

The issue we must decide is whether the pre-hearing orders that precipitated the final resolution of Chelsea's claim by private settlement, a few accompanied by the threat of sanctions, provide sufficient judicial imprimatur to make Chelsea a "prevailing party" for purposes of the Supreme Court's reasoning in Buckhannon. We review this question of law de novo. Doe v. Boston Pub. Sch., 358 F.3d 20, 23 (1st Cir. 2004).

## A. The IDEA and the Massachusetts Special Education Law

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs." 20 U.S.C § 1400(d)(1)(A).[6] In order to determine whether a child has a disability for purposes of the IDEA, and to evaluate the particular needs of that child if deemed eligible for special education services, an IEP Team is to convene and prepare an IEP. Id. §§ 1414(d)(1)(A) & (B). In the event the state or local educational agencies do not follow this procedure, for example by not convening an IEP Team meeting when required, not preparing and implementing an IEP in a timely fashion, or not preparing an IEP that adequately addresses the needs of the child, the IDEA provides certain procedural safeguards, including the right to an impartial due process administrative hearing, see id. § 1415(f),[7] and a right to appeal an adverse decision in that hearing to the federal district court, see id. § 1415(i)(2). The IDEA also provides that the parents of a child with a disability who is the prevailing party in

---

[6]The Massachusetts Special Education Law, Mass. Gen. Laws ch. 71B, implements the requirements of the IDEA.

[7]20 U.S.C. § 1415(f) provides: "Whenever a complaint has been received [with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child], the parents . . . involved in such complaint shall have an opportunity for an impartial due process hearing." In Massachusetts, such hearings are conducted by the Bureau of Special Education Appeals ("BSEA") by a BSEA hearing officer.

such an administrative proceeding or law suit may recover, in the court's discretion, reasonable attorneys' fees. Id. § 1415(i)(3)(B).

The award of attorneys' fees for a prevailing party under the IDEA is subject to certain limitations, including one that provides: "Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened as a result of an administrative proceeding or judicial action . . . " Id. § 1415(i)(3)(D)(ii). Chelsea's Parents contend that an award under this paragraph is not subject to the "prevailing party" requirements of the general IDEA provision dealing with the award of attorneys' fees, id. § 1415(i)(3)(B)(i). We disagree. Section 1415(i)(3)(B) of Title 20 clearly provides that the prevailing party requirement applies to "any action or proceeding brought under this section." (Emphasis added.). This "section" refers to "section 1415," and includes all administrative and civil actions brought under the IDEA.

**B. Buckhannon and the "Prevailing Party" Requirement**

To evaluate whether a party is a "prevailing party" for purposes of the IDEA, we are guided by the Supreme Court's decision in Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598 (2001).[8] See Doe, 358

[8]Although the issue in Buckhannon was the fee-shifting provisions of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq., and the Americans With Disabilities Act of 1990, 42

F.3d at 29-30 (holding that Buckhannon applies to the fee-shifting provision of the IDEA). In Buckhannon, the Supreme Court held that for a party to be considered "prevailing," there must be a "material alteration of the legal relationship of the parties," 532 U.S. at 604 (quotation omitted), and there must be "judicial imprimatur on the change." Id. at 605 (emphasis in original).[9]

The Buckhannon Court went on to state that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur." Id. (emphasis in original). The Court then noted that it had "only awarded attorneys' fees where the plaintiff ha[d] received a judgment on the merits or obtained a court-ordered consent decree." Id. By contrast, the Court stated that it had not awarded attorneys' fees "where the plaintiff ha[d] secured the reversal of a directed verdict, or acquired a judicial pronouncement that the defendant ha[d] violated the Constitution unaccompanied by 'judicial relief.'" Id. at 605-06 (emphasis in original) (internal citation omitted). The Court expressly

U.S.C. § 12101 et seq., this court held in Doe that the Supreme Court's reasoning in "Buckhannon is presumed to apply generally to all fee-shifting statutes that use the 'prevailing party' terminology, including the IDEA." Doe, 358 F.3d at 25 (citing T.D. v. La Grange Sch. Dist. No. 102, 349 F.3d 469, 475 (7th Cir. 2003)).

[9]It is undisputed that, for purposes of the IDEA, a party may "prevail" in an administrative hearing--thus the appropriate involvement of a BSEA hearing officer can provide the necessary "judicial imprimatur."

rejected the "'catalyst theory,' which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." Id. at 601, 605.

**C. Cases Interpreting Buckhannon**

There is disagreement among our sister circuits whether the Supreme Court intended "judgments on the merits" and "consent decrees" to be the only forms of success conferring prevailing party status, or whether these two forms are mere examples of the types of relief that can confer such status. Compare Christina A. v. Bloomberg, 315 F.3d 990, 993 (8th Cir. 2003) (stating that "Buckhannon . . . makes it clear that a party prevails only if it receives either an enforceable judgment on the merits or a consent decree."), with Pres. Coalition v. Fed. Transit Admin., 356 F.3d 444, 452 (2d Cir. 2004) (holding that "Buckhannon does not limit fee awards to enforceable judgments on the merits or to consent decrees"); see also T.D. v. La Grange Sch. Dist. No. 102, 349 F.3d 469, 479-80 (7th Cir. 2003) (implicitly holding that "prevailing party" status under Buckhannon is not limited to judgments on the merits and consent decrees in finding a party was "prevailing" after it obtained a court-ordered case-study evaluation under the IDEA despite ultimately resolving the case by private settlement); Smyth v. Rivero, 282 F.3d 268, 281 (4th Cir. 2002) (implicitly holding that fee awards are not limited to enforceable judgments on

the merits and to consent decrees in finding that "an order containing an agreement reached by the parties may be functionally a consent decree for purposes of [Buckhannon], even if not entitled as such").

In this circuit, we have not squarely addressed whether judgments on the merits or consent decrees are the only forms of relief sufficient to confer prevailing party status, whether a functional equivalent of such relief may be adequate, or whether any other types of relief could satisfy Buckhannon's requirements. In a case decided after Buckhannon, but expressly not deciding whether Buckhannon applied to the fee-shifting provisions of the IDEA, we awarded fees to a party who had successfully fended-off a motion for a temporary restraining order, noting that "the denial of the School District's motion [for a TRO] was effectively a final judgment on the merits on [one of the School District's claims]." Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d 9, 16-17 n.6 (1st Cir. 2003). Subsequently, in Doe, in holding that Buckhannon indeed did apply to the fee-shifting provisions of the IDEA, and thus barred recovery for fees following a purely private settlement, we took "no position on whether forms of judicial imprimatur other than a judgment on the merits or a court-ordered consent decree may suffice to ground an award of attorneys' fees." Doe, 358 F.3d at 24 n.4.

Here, Chelsea's Parents did not obtain a final judgment on the merits, and their private settlement was not incorporated into a consent decree. Thus, Chelsea's Parents do not satisfy the requirements of a narrow reading of Buckhannon. See Christina A., 315 F.3d at 993 (holding that a party need obtain either a consent decree or a final judgment on the merits to be deemed a "prevailing party" under Buckhannon). Furthermore, we need not decide today whether a party could prevail under Buckhannon in the absence of a consent decree or a final judgment on the merits, because, as we will discuss below, neither the interlocutory orders and rulings, nor the final order dismissing the case provide the necessary judicial imprimatur on the change in the legal relationship between the parties. See Buckhannon, 532 U.S. 604-05. Lastly, we need not rule out the possibility that an egregious case of foot-dragging terminated by a judicial or quasi-judicial procedural order may be sufficient to confer prevailing party status under Buckhannon, because the record does not reveal that Fitchburg was being willfully obstructionist.

In one line of cases applying an expansive reading of Buckhannon, courts have held that "[w]here a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered, the court's approval and the attendant judicial over-sight (in the form of continuing jurisdiction to enforce the agreement) may be equally apparent,"

such that an order containing the agreement "may be functionally a consent decree for purposes of [Buckhannon], even if not entitled as such." Smyth, 282 F.3d at 281; see T.D., 349 F.3d at 478 ("We agree with the Fourth Circuit's recent conclusion [in Smyth] that some settlement agreements, even though not explicitly labeled as a 'consent decree' may confer 'prevailing party' status, if they are sufficiently analogous to a consent decree."); John T. v. Del. County Intermediate Unit, 318 F.3d 545, 558 (3d Cir. 2003) (stating that "a stipulated settlement could confer prevailing party status . . . . where it (1) contained mandatory language, (2) was entitled 'Order,' (3) bore the signature of the District Court judge, not the parties' counsel, and (4) provided for judicial enforcement") (emphasis and citation omitted); see also Smyth, 282 F.3d at 281 ("We doubt that the Supreme Court's guidance in Buckhannon was intended to be interpreted so restrictively as to require that the words 'consent decree' be used explicitly."). For an order to be considered the functional equivalent of a consent decree, however, "[t]he obligation to comply with a settlement's terms must be expressly made part of a court's order for jurisdiction to enforce the settlement after dismissal of the action to exist." Smyth, 282 F.3d at 283; see Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) ("The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them a part of his order."). Thus, "[e]ither incorporation of the terms

of the agreement or a separate provision retaining jurisdiction over the agreement will suffice for this purpose." Smyth, 282 F.3d at 283. In contrast, "[w]here a court merely recognizes the fact of the parties' agreement and dismisses the case because there is no longer a dispute before it, the terms of the agreement are not made part of the order and consequently will not serve as a basis of jurisdiction." Id.

Here, Chelsea does not argue that the order dismissing her case is the functional equivalent of a consent decree, and thus we deem that argument waived. See, e.g., Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 43 (1st Cir. 2003) ("Issues raised on appeal in a perfunctory manner (or not at all) are waived.").[10]

A second line of cases espousing an expansive reading of Buckhannon has developed, holding that the relief obtained by one party satisfied the requirements of Buckhannon, even though the party "prevailing" on that one issue ultimately lost in the final judgment or entered into a private settlement agreement for the remaining claims. Essential to each of these cases is the judge's substantive involvement providing the necessary judicial imprimatur on the change in the legal relationship between the parties.

---

[10]We note that neither party included a copy of the order of dismissal by the BSEA in the record before the district court.

In T.D. v. La Grange School District Number 102, 349 F.3d at 480, the Seventh Circuit held that even though the parties ultimately entered into a private settlement (that was not embodied in a court order), the parents were "prevailing" in an administrative hearing for purposes of Buckhannon when they successfully convinced the hearing officer to order the school district to conduct a case-study evaluation to determine their child's eligibility for benefits under the IDEA. The Seventh Circuit, reversing in part the decision of the district court, held that the parents were eligible for an award of attorneys' fees for "prevailing" in the administrative hearing, but not for the time spent in negotiations for the final settlement. Id. The Seventh Circuit stated that the determination that the child was eligible for IDEA benefits as a result of the court-ordered case-study evaluation "represented some success for T.D. because prior to his request for the due process hearing the school had not acknowledged that T.D. was even eligible for IDEA benefits." Id. Thus, a material alteration in the legal relationship between the parties (that is, the school district's determination that T.D. was eligible for special education services), was effected by the hearing officer's order (after a review of the merits that the school district was legally required to conduct a case-study evaluation), which provided the necessary judicial imprimatur on T.D.'s relief. See id.

Similarly, the Second Circuit in Preservation Coalition of Erie County v. Federal Transit Administration, 356 F.3d at 452, held that a party was "prevailing" under Buckhannon when it successfully convinced the district court to order the defendants to prepare a new Supplemental Environmental Impact Statement (SEIS) under threat of injunctive relief, even though the case was ultimately resolved by a settlement agreement embodied in a Stipulation and Order.[11] After determining that the Stipulation and Order was "functionally a private settlement agreement," the court concluded that "appellee obtained prevailing party status under Buckhannon when it obtained a court order requiring appellants to prepare a SEIS under threat of further injunctive relief." Id. at 451, 452. This was because "[t]he SEIS was both judicially sanctioned and effectuated a substantive, material alteration in the legal relationship of the parties." Id. at 452 (emphasis in original). And, as the Second Circuit noted, "[a]lthough the district court declined to issue an injunction, it found the [Final Environmental Impact Statement] inadequate" and ordered the defendants to prepare a [Supplemental Environmental Impact

[11] Preservation Coalition involved the fee-shifting provision of the National Environmental Policy Act, which allows fee awards to a party who "substantially prevails" in an action to enforce its provisions. The Second Circuit has held that "the terms 'prevailing party' and 'substantially prevails' are fundamentally the same for purposes of determining whether a plaintiff can recover under a fee-shifting statute," and thus Buckhannon applies. Pres. Coalition, 356 F.3d at 450 n.3.

Statement]." Id. at 448. Thus, the judge's substantive order effected a material alteration in the legal relationship between the parties.

In Maine School Administrative District Number 35, although not directly applying Buckhannon, we followed similar reasoning in holding that parents who successfully defended against a school district's attempt to change their child's placement were prevailing parties and thus entitled to attorneys' fees under the IDEA. See 321 F.3d at 17. We noted that "[b]ecause the district court denied injunctive relief on the basis that the School District had not adduced sufficient proof to satisfy the [standard for changing the student's placement], it [was] readily evident that the appellants successfully defended [the original suit brought against the parents to keep their child out of the school because the school district thought the child was dangerous] on the merits." Id. Thus, the district judge's substantive ruling was the cause of a material alteration in the legal relationship between the parties.

**D. Applying Buckhannon to Chelsea's Case**

We begin our application of the law to the facts of Chelsea's case with the obvious--the relief obtained by Chelsea at the administrative level was not in the form of a consent decree or a final judgment on the merits, and thus does not warrant attorneys' fees under a narrow reading of Buckhannon. See

Christina A., 315 F.3d at 993 (holding that a party need obtain either a consent decree or a final judgment on the merits to be deemed a "prevailing party" under Buckhannon). Chelsea wisely does not argue as such. But, our inquiry does not end there. As we have not decided in this circuit whether to adopt a narrow or broad reading of Buckhannon, we do not foreclose the possibility of a broad reading, and look to determine whether Chelsea's relief, even though not in the form of a consent decree or a final judgment on the merits, comports with the overarching requirements of Buckhannon; that is, whether the involvement of the BSEA Hearing Officer provided the necessary judicial imprimatur on a material alteration of the legal relationship between the parties. See Buckhannon, 532 U.S. at 604-05. We thus first identify the change in the legal relationship between Chelsea and Fitchburg, and then ask whether that change was effected by the judicial actions of the BSEA Hearing Officer.

1. The Change in the Legal Relationship

As a result of her initiation of proceedings against Fitchburg, Chelsea did receive all of the relief she requested. In Chelsea's complaint, she initially sought an order requiring Fitchburg to: (1) pay for Chelsea's tutoring at home and in the hospital; (2) convene an IEP meeting to address Chelsea's special education needs; and (3) implement the IEP. By the time the case was dismissed by the BSEA Hearing Officer, Fitchburg agreed to do

everything requested. Thus, there was a material alteration in the legal relationship between Chelsea and Fitchburg. Under Buckhannon, however, that is not enough to justify an award of attorneys' fees; there must be judicial imprimatur on that change. See 532 U.S. 604-05.

2. The Involvement of the BSEA Hearing Officer

The judicial involvement in this case came in the form of a series of orders and rulings by the BSEA Hearing Officer that memorialized the voluntary concessions made by Fitchburg and attempted to keep the settlement process moving forward in a timely manner.[12] At the time the orders were imposed, the BSEA Hearing Officer had not yet joined issue on the question of Chelsea's substantive entitlement to an IEP because the BSEA Hearing Officer had not yet convened a due process hearing. The issue before the BSEA Hearing Officer at the time of her orders and rulings was simply whether she should continue to promote settlement efforts or, instead, take immediate action on the parents' request for a due process hearing under 20 U.S.C. § 1415(f). Thus, it appears from the record that the BSEA Hearing Officer's orders and rulings were issued to justify the BSEA Hearing Officer's implicit decision

[12]Chelsea does not seriously contend that there was judicial imprimatur on Fitchburg's decision to reimburse her parents for prior tutoring at home and in the hospital, part of the relief she received as a result of the settlement agreement. Thus, we appropriately limit our discussion to whether there was judicial imprimatur on Fitchburg's convening of the IEP meeting.

to delay the due process hearing in favor of private settlement, not to place the weight of judicial authority behind Fitchburg's substantive concession that Chelsea was entitled to an IEP.

To be sure, standing alone, the BSEA Hearing Officer's December 20, 2001 ruling requiring Fitchburg to convene a IEP meeting "in no event . . . later than January 11, 2002" might be viewed as an order, similar to the order in T.D., 349 F.3d at 480, compelling Fitchburg to convene an IEP meeting because the Hearing Officer determined Fitchburg was legally required to do so under the IDEA. A closer look at the record, however, reveals that this was merely a ruling memorializing a substantive concession by Fitchburg and an effort to keep pre-hearing settlement negotiations moving forward. Without being compelled to do so by the BSEA Hearing Officer, Fitchburg had orally (and voluntarily) agreed to convene an IEP meeting on December 12, 2001 during the December 4, 2001 BSEA Hearing Officer-initiated conference call. When Fitchburg failed to convene the meeting on December 12, Chelsea filed a motion requesting that the BSEA Hearing Officer order Fitchburg to convene the meeting. Significantly, Fitchburg did not oppose the motion. Thus, when the BSEA Hearing Officer issued its ruling stating that "Fitchburg will use its best efforts to convene the TEAM on January 4, 2002 but in no event . . . any later than January 11, 2002," the officer was mandating that Fitchburg convene a TEAM meeting by a specified date. The BSEA Hearing Officer never

reviewed the merits of whether Fitchburg was required under the IDEA to convene the IEP meeting; the Hearing Officer only was requiring Fitchburg to follow through with what Fitchburg had already voluntarily promised to do.

Lastly, we note that in this case, the BSEA Hearing Officer can be described as being simply efficient and business-like, forcing Fitchburg to move more rapidly. It is not clear from the record that Fitchburg was being willfully obstructionist. And, at no point did Fitchburg refuse to comply with an order of the BSEA Hearing Officer, nor was the Hearing Officer ever compelled to make good on her threats of sanctions against Fitchburg. Thus, we need not today foreclose the possibility that such judicial intervention in a clearer, or more extreme, case might justify an award of attorneys' fees under Buckhannon.

## III. CONCLUSION

The pre-hearing orders that hastened the final resolution of Chelsea's claim by private settlement did not provide sufficient judicial imprimatur on Chelsea's relief to make her a "prevailing party" under Buckhannon. The district court was correct to deny Chelsea attorneys' fees under 20 U.S.C. § 1415(i)(3)(B), and, as the prevailing party standard announced in Buckhannon also applies to an award of fees pursuant to 20 U.S.C. § 1415(i)(3)(D)(ii), Chelsea's claim under that subparagraph fails as well. The

district court's orders, granting summary judgment to Fitchburg and denying Chelsea's motion for summary judgment, are **AFFIRMED.**