## Louis Newell[1] *vs.* Department of Mental Retardation.

Middlesex. November 7, 2005. - March 20, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Civil Rights,* Attorney's fees. *Mentally Retarded Person. Department of Mental Retardation. Practice, Civil,* Attorney's fees, Contempt. *Contempt.*

In a civil action brought against the Department of Mental Retardation (department) to obtain essential services for the plaintiff, a mentally retarded and physically vulnerable man, in which the plaintiff, who had failed to secure a judgment on the merits, made a posttrial motion for injunctive relief that ultimately resulted in the department's agreement to the changes that the plaintiff desired in his individual service plan, counsel for the plaintiff was not entitled to recover attorney's fees under 42 U.S.C. § 1988 (2000), where the plaintiff was not a "prevailing party" within the meaning of *Buckhannon Bd. & Care Home, Inc.* v. *West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 600 (2001), in that there was no judicial imprimatur on the changes to which the department agreed regarding the terms of the plaintiff's individual service plan and the services that he should and would receive, and even if certain statements by the motion judge could be construed to satisfy the requirement of a judicial imprimatur, no material alteration of the legal relationship of the parties resulted. [297-305]

In a civil action, the judge abused her discretion in finding the defendant in contempt of an order that the judge concluded she had issued orally at a particular hearing, where the transcript of that hearing (which was not available to the judge at the time she made her finding, despite her requesting a transcript) revealed that the judge issued no such order at that hearing. [305-309]

Civil action commenced in the Superior Court Department on November 6, 1995.

The case was tried before *Elizabeth M. Fahey,* J., a motion for attorney's fees was heard by her, and a complaint for contempt was also heard by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

[1]By his guardian, Eve Ross.

*Daniel S. Sharp* (*Elaine Whitfield Sharp* with him) for the plaintiff.

*Ronald F. Kehoe*, Assistant Attorney General (*Jacquelyn Berman* with him) for the defendant.

MARSHALL, C.J. In *Buckhannon Bd. & Care Home, Inc.* v. *West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 600 (2001) (*Buckhannon*), the United States Supreme Court ruled that "a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct" is not a "prevailing party" for purposes of awarding attorney's fees under Federal fee-shifting statutes allowing such awards. The Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988 (2000), is one such statute.[2] We transferred this case here on our own motion to consider whether counsel who represented the plaintiff, a mentally retarded and physically vulnerable man, may recover attorney's fees under 42 U.S.C. § 1988. The underlying litigation has been pursued in the Superior Court for more than one decade, and was resolved only when essential services for the plaintiff were finally provided by the Department of Mental Retardation (department). A judge in the Superior Court concluded that the litigation spurred the department to provide the services long denied to the plaintiff: she noted that the plaintiff would "never" have been provided the services "had it not been for this litigation." The issue of the recovery of attorney's fees here is, however, one of Federal law. On a careful review of the voluminous record and with due regard for the legal services provided by counsel to their client to secure basic necessities for him, we conclude that under the command of *Buckhannon* and its progeny, attorney's fees may not be awarded in this case. We affirm the judge's order vacating her earlier award of attorney's fees.

---

[2]*Buckhannon Bd. & Care Home, Inc.* v. *West Virginia Dep't of Health & Human Resources*, 532 U.S. 598 (2001) (*Buckhannon*), concerned whether the plaintiffs were the "prevailing party" under the fee-shifting provisions of the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. The United States Supreme Court's reasoning in *Buckhannon* is presumed to apply generally to Federal fee-shifting statutes that use the term "prevailing party." See, e.g., *Doe* v. *Boston Pub. Schs.*, 358 F.3d 20, 25 (2004).

Also at issue is the department's appeal challenging a ruling that statements made by the judge during a hearing on the plaintiff's motion for injunctive relief constituted an order enforceable by contempt proceedings.[3] We reverse the judge's order holding the department in contempt and awarding damages to the plaintiff.

1. *Background.* We summarize the judge's findings of fact, and describe the lengthy procedural history of this case. See *Palmetto Props., Inc.* v. *County of DuPage*, 375 F.3d 542, 543 (7th Cir. 2004), quoting *McGrath* v. *Toys "R" Us, Inc.*, 356 F.3d 246, 253 (2d Cir. 2004) (to determine whether award of attorney's fees is appropriate under *Buckhannon*, "a meticulous analysis of the particular judgments and orders entered in a case is necessary").

The plaintiff is a sixty-six year old severely mentally retarded man with no family. He suffers from Fahr's Disease, a degenerative neurological disorder that causes him to have difficulty walking and maintaining his balance. He has been in the care of the Commonwealth since early childhood. In 1995, while in the department's custody,[4] the plaintiff suffered serious injuries, including a head injury, resulting from a series of falls and an assault he suffered while living in a department-sponsored group home, Charles River Association for Retarded Citizens. He was hospitalized at Massachusetts General Hospital (MGH) in June, 1995, and remained there for some six months. Eventually the plaintiff's guardian was required to move him from MGH. Believing that placement in the department-sponsored group home would not be safe for the plaintiff, the guardian transferred the plaintiff to a nursing home over which the department had no control.

In November, 1995, while he was still a patient at MGH, the

---

[3]The judge held the department in contempt for its failure to provide the plaintiff with one-to-one care and a private room by a specific date, April 30, 2000.

[4]The department has the responsibility to "take cognizance of all matters affecting the welfare of the mentally retarded citizens of the commonwealth," G. L. c. 19B, § 1, and to "develop and maintain, subject to appropriation and in accordance with its standards, comprehensive community mental retardation services including specialized services for both children and adults." G. L. c. 19B, § 13.

plaintiff (through his guardian) commenced this action against the department.[5] The plaintiff alleged that injuries suffered in 1994 and 1995 were caused by the department's failure to provide him with an individual service plan (ISP)[6] requiring one-to-one care and supervision.[7] The plaintiff asserted various State claims and claims under 42 U.S.C. § 1983, and sought compensatory damages. He also sought injunctive relief ordering the department to place him in an appropriate facility that could provide one-to-one care and supervision.

A request for a preliminary injunction, filed when the action was commenced, was denied in March, 1996, after the department agreed to amend the plaintiff's ISP.[8] The case eventually

[5]Also named as defendants were several department officials, in their individual and official capacities, and the group home where the plaintiff was living at the time of his injuries. The plaintiff later settled his negligence claims against the group home. One of the individual defendants was dismissed from the suit, and a directed verdict was entered in favor of the remaining individual defendants on all claims.

[6]The department's regulations in effect at the relevant time and promulgated pursuant to G. L. c. 19B, § 14, and G. L. c. 123B, § 2, provided: "It is the responsibility of the Department and its service providers to engage in service planning, including the provision of preliminary assessments, case management and comprehensive assessments, individual service plans and service referrals, in accordance with the provisions of [104 Code Mass. Regs. §§ 16.00] for the benefit of individuals requesting, receiving, and/or referred for mental health services." 104 Code Mass. Regs. § 16.02(1) (1993).

An individual service plan (ISP) "shall identify services, programs and service providers based on: 1. the client's needs as identified in the comprehensive assessment; and 2. the availability of specific services." 104 Code Mass. Regs. § 16.05(1) (1993). An ISP "shall include: (a) the client's needs in terms of assessed strengths and weaknesses, including identification of each client's assessed physical health care needs and consideration of the client's preferences regarding services; (b) optimal services to the client which reflect the client's needs without references to existing resources; (c) available services, program and service providers which are, to the maximum extent possible, adequate, appropriate, consistent with the client's needs and least restrictive of the client's freedom; (d) target dates for commencement of each service or date each service commenced; (e) a description of means to ensure that services are provided in a coordinated and complementary manner; (f) a description of the means for monitoring the effectiveness of services to be provided . . . ." 104 Code Mass. Regs. § 16.05(5) (1993).

[7]The plaintiff has argued throughout the litigation that the department was required to provide him with one-to-one care and supervision, in part because of his degenerative neurological disorder.

[8]On November 6, 1995, the plaintiff filed a request for a preliminary injunc-

went to trial in December, 1999. A directed verdict was entered in favor of the department on all claims, except one claim for negligence.[9] The jury returned a verdict in favor of the plaintiff on that count, and awarded damages in the amount of $482,600 for the injuries he had sustained. On August 29, 2000, the judge allowed the department's motion for judgment notwithstanding the verdict, concluding that the department was immune from liability under G. L. c. 258, § 10 (*j*), and that the plaintiff failed to produce sufficient evidence to allow the jury to draw a reasonable inference that the department had been negligent. The plaintiff does not raise any issues related to that order.

At the conclusion of the trial but before the judge's ruling on the department's motion for judgment notwithstanding the verdict, the plaintiff renewed his request for injunctive relief. See note 8, *supra.* He again sought an order that the department amend the plaintiff's ISP[10] to require the provision of one-to-

---

tion ordering one-to-one care and supervision. On December 15, 1995, the clerk's office issued a notice of docket entry, which included an order that "[the department] shall complete an accelerated assessment of [the] plaintiff . . . not later than 12/29/95" and that the "plaintiff's guardian shall provide to [the department] any and all medical information in her possession, custody or control." The notice also stated: "On the record before the Court, it is not apparent that one to one care is the only means by which injury to the plaintiff can be avoided."

On January 17, 1996, the judge issued an order requiring that the parties either "complete informal discussions to resolve this case" or "submit their joint or separate proposed orders for an accelerated I.S.P. process for plaintiff." On March 1, 1996, the judge denied the plaintiff's request for injunctive relief, concluding that "[i]n view of the [department's] agreement to provide a final Individual Service Plan under 104 [Code Mass. Regs.] § 16.11 within one week . . . which plan may be appealed by the guardian under 104 [Code Mass. Regs.] § 16.11, the Court determines that there is no need for interlocutory relief *at this time*" (emphasis added).

[9]The defendants' motion for a directed verdict was also allowed on all claims, including negligence, as to the individual defendants. See note 5, *supra.*

[10]In 1996, in response to the plaintiff's initial request for injunctive relief, the department amended the plaintiff's ISP. At the time the plaintiff was still in MGH. The 1996 ISP identified the "long range plan" for the plaintiff as living in a community-based residential placement, with one-to-one staffing "during his transition to the community, to be reviewed on a quarterly basis by his ISP Team." Apparently because the plaintiff's guardian and the department could not agree on a suitable residential placement when the plaintiff was discharged from MGH, the department provided no services to the

one care and supervision, and added a claim that the department had violated his rights under a consent decree entered in a class action, *Ricci* v. *Okin*, 823 F. Supp. 984 (D. Mass. 1993) *(Ricci)*.[11] It is the 2000 injunctive relief sought by the plaintiff that forms in large part the basis of his *Buckhannon* claim. For purposes of resolving those claims, the critical events, which we describe in greater detail below, are as follows: (1) on February 10, February 17, and March 29, 2000, the judge, who had presided at the trial, held hearings on the plaintiff's renewed motion for injunctive relief, and on March 29, she allegedly issued an oral order that is the subject of the contempt claim; (2) on May 31, 2000, the plaintiff filed a complaint for contempt for noncompliance with the judge's March 29, 2000, order; (3) by order dated December 1, 2000, and entered on January 2, 2001, the judge dismissed the plaintiff's request for injunctive relief as moot, awarded attorney's fees to the plaintiff, and held the department in contempt for failure to comply with one aspect of her March order; (4) on January 22 and 24, 2001, respectively, the department filed a notice of appeal, and the plaintiff cross-appealed[12]; (5) on December 31, 2001, the department filed a motion for reconsideration concerning the award of attorney's fees in light of the Supreme Court's decision in *Buckhannon*, issued after the judge's order on attorney's fees; (6) on March 18, 2002, the judge vacated her award of attorney's fees; (7) on April 2, 2002, the plaintiff filed an amended notice of appeal regarding the vacation of the attorney's fee award.

The focal point of our inquiry is the March 29, 2000, hearing for purposes of both our *Buckhannon* analysis and the contempt

plaintiff between 1996 and 2000. The 1996 ISP was still in place when the plaintiff renewed his request for injunctive relief in 2000. See discussion, *infra*.

[11]*Ricci* v. *Okin*, 823 F. Supp. 984 (D. Mass. 1993) *(Ricci)*, was a class action brought by mentally retarded citizens against the Commonwealth alleging Federal civil rights violations. The action culminated in a consent decree requiring the Commonwealth to "substantially provide services to each class member on a lifetime basis," *id.* at 986, in accordance with an annual individual service plan that would be provided to each class member.

[12]The department appealed from the December 1, 2000, ruling, which awarded the plaintiff attorney's fees under 42 U.S.C. § 1988 and held the department in contempt. The plaintiff appealed from the December 1, 2000, denial of attorney's fees for the contempt action.

ruling. To place it in context, we review in greater detail the posttrial stages in the litigation, preceding and following that hearing.

As noted earlier, in December, 1999, following the trial, the plaintiff renewed his request for injunctive relief that the department complete a new ISP to require "in particular" some form of one-to-one care and supervision to assure the plaintiff's safety and allow him to live "in the most normal, least restrictive manner possible."[13,14] At that time, the plaintiff continued to reside in the nursing home where his guardian had placed him after his discharge from MGH. He claimed in his renewed request that the services were required in part because he is a member of the class certified in *Ricci*. Three hearings on the plaintiff's motion then followed: February 10 and 17, and March 29, 2000. At the February 10 hearing, the department did not contest that an amended ISP was required, but informed the judge that an amended ISP had not been prepared. The judge "ordered" that the department "prepare and serve on the court and plaintiff's counsel the ISP . . . by the end of business on [February] 15th."[15] At the February 17 hearing, the judge "order[ed]" the department to prepare a "more complete ISP" within three weeks because she was not satisfied with the draft ISP presented to her. Between that date and the next hearing, the department focused on revising and finalizing a new ISP for the plaintiff.

We turn now to the hearing on March 29. By that time the

[13]The plaintiff claimed that there were only two alternatives for him: one alternative would confine him "to his wheelchair and his bed," and the second would allow him "to walk, with a helping hand, and to enjoy life as best he can." As the judge later found, in preparing a revised ISP, "community participation was then probably the most important ingredient to enable [the plaintiff] to maximize his potential," and the nursing home was unable to provide the plaintiff with access to the community.

[14]At a hearing on the plaintiff's motion, the judge ordered the department to evaluate the plaintiff and prepare a new ISP. The department's regulations required that it convene an ISP meeting within ten days, but no later than thirty days, of the completion of the assessment report. See 104 Code Mass. Regs. § 16.05(2) (1993).

[15]After a discussion with a physical therapist treating the plaintiff, the judge "order[ed]" in the meantime that the nursing home where the plaintiff resided "continue to do what it is doing," that is, work with the plaintiff to increase his ability to walk, and that the costs be borne by the department.

judge had rejected the initial revised ISP presented to her in February, had granted a three-week extension sought by the department, was aware that the department had met with the plaintiff's guardian, and had every expectation that the department would comply with her orders. The judge reviewed a copy of the new ISP prepared by the department, which the plaintiff's guardian had received but had not signed. The new ISP stated that "by April 30th" the plaintiff would have one-to-one care and supervision "for up to twenty-five hours each week."[16] The department's ISP service coordinator[17] testified that funding for the plaintiff's one-to-one care had been "approved," and that although she did not know "how the funding works," she had set an April 30 deadline. These represented substantial and important changes to the services the department would provide to the plaintiff. Some ambiguities in the revised ISP needed to be resolved, however. Specifically, the ISP did not provide for a private room for the plaintiff, and counsel expressed concern that the one-to-one care specified in the new ISP was only "up to" twenty-five hours per week when he was not participating in community activities and would therefore force the plaintiff to choose between community activities and one-to-one care. The judge then engaged in a colloquy with the ISP service coordinator who agreed that the plaintiff would receive "approximately" twenty-five hours of one-to-one care per week, and not just "up to" that amount. The judge "asked" the department to amend the existing ISP to include that relief:

> "I am going to ask that [the department] amend this ISP to include . . . that, at the present time, [the plaintiff] has a private room, that he will have his private room, at [the department's] expense, until an appropriate roommate is determined. . . . .[18] And I am also asking that [the department] amend the [ISP] . . . to just add a sentence

[16]A copy of the 2000 ISP is not included in the record. The judge read the quoted portion from the ISP into the record at the March 29 hearing.

[17]According to the ISP service coordinator's testimony, her role at the department is to "coordinate and facilitate" the ISP process, "coordinate services between residential and day providers," "assist people applying for benefits . . . such as . . . food stamps," and "act as an advocate on people's behalf."

[18]While living in the department-sponsored group home, the plaintiff had

. . . that [the plaintiff] will have approximately twenty-five hours a week of one-to-one [care] . . . ."

When the department objected on the grounds that the judge had no authority to determine the content of an ISP, citing *Matter of McKnight*, 406 Mass. 787 (1990), the judge responded that she was "only asking [the department] . . . to put in the ISP, what [the department] has already agreed to." She then specifically inquired whether the department had agreed to provide one-to-one care for approximately twenty-five hours per week, to which counsel for the department responded: "Yes. The service coordinator has agreed to that." Following this exchange the judge then inquired of counsel whether he had any other concerns not addressed in the ISP, to which counsel responded, "No."

As to injunctive relief, because the department had agreed to provide one-to-one care and a private room by April 30, 2000, the judge inquired of plaintiff's counsel that "with the current ISP, you really don't need me to do anything." He responded that "as the result of litigation" counsel had "gotten for [the plaintiff] what we want." He did request that the judge make findings of fact that the plaintiff is a member of the *Ricci* class, see note 11, *supra*, and that the department "as a matter of law, [was] required to provide [the plaintiff] services in accordance with the ISP and in accordance with the *Ricci*-related [regulations]." The judge did not issue a written order following the March 29 hearing.

By April 30, 2000, the one-to-one services for the plaintiff had not been provided, nor apparently had he been moved to a private room in the nursing home. See note 19, *infra*. On May 31, 2000, the plaintiff filed a complaint for contempt, claiming that the department had failed to comply with the judge's March 29 order. The docket does not reflect any opposition from the department and we have been provided with none. On June 15, 2000, the judge held a hearing on the complaint for contempt, by which time the department had at last amended the plaintiff's

his own private room, but was not receiving one-to-one care and supervision. In the nursing home, the plaintiff was required to share a room with another patient. Access to a private room was one focus of the February and March, 2000, hearings.

ISP to provide for one-to-one care and a private room, the plaintiff had been moved to a private room, and while one-to-one care had not actually commenced, it "[had] very recently been arranged."

At the June hearing, the judge discussed with the parties a date for scheduling a trial on the plaintiff's complaint for contempt. She requested that plaintiff's counsel inform her whether the trial would consist solely of the claim for damages, in light of the fact that the department was, in the words of the plaintiff's counsel, "[c]lose to being" in compliance with the judge's March 29 order, and likely would be fully in compliance by the time of trial.[19]

On September 6 and 8, 2000, the judge held hearings limited to the issue of contempt damages.[20] The department claimed that it was not in contempt of any "order." The department's ISP service coordinator for the plaintiff testified.[21] The judge said she would order a transcript of the March 29 hearing in time for the September 8 hearing. The judge received only three

---

[19]The judge later found that, as a "direct result" of the department's being served with the complaint for contempt on June 1, 2000, the plaintiff was moved to a private room on June 5, the department produced an ISP that incorporated the provision of a private room and approximately twenty-five hours of one-to-one care per week on June 13, 2000, and the plaintiff started receiving one-to-one care on June 16.

[20]On August 10, 2000, the judge issued an order finding that the plaintiff was a member of the class of litigants entitled to lifetime services under *Ricci.* She further found that, as "the result of the proceedings in this matter," the department had provided the plaintiff with an ISP ("dated February 11, 2000 as modified on March 29, 2000 and with further modification as ordered on March 29, 2000") that substantially complied with the requirements of *Ricci.*

[21]When asked whether she could "tell us what the court ordered on March 29th, if anything, pertaining to one-to-one visitation and care," the ISP service coordinator responded: "I think that . . . the one-to-one for [the plaintiff] would be in place on April 30." Shortly thereafter, plaintiff's counsel asked the ISP service coordinator again whether she had "any doubt" that the judge had ordered the one-to-one services to commence by April 30. She answered: "I, I'm not sure if I was the one who said it could be done by April 30th or not. To be honest with you, I don't know what — I was saying, 'Yes, I thought it could be done by April 30th.' And I, I don't know if that was a direct order that it had to be done or if it was me saying that's when I, in all good faith, thought that we could have them in place." When plaintiff's counsel pressed her on the same point, she again responded: "I don't recall if it was the [j]udge who ordered it, or if it was what we had put into the ISP and we had all agreed upon."

pages of the March 29 transcript in time for the September 8 hearing,[22] at which the ISP service coordinator again testified. She confirmed that she was the author of an electronic mail message sent to an attorney in the department after the March 29 hearing, informing the attorney that "the deadline for providing one-to-one services for [the plaintiff was] April 30."

On December 1, 2000, the judge entered a written order on the plaintiff's motion for injunctive relief and his complaint for contempt. She dismissed the plaintiff's request for injunctive relief as moot. She awarded the plaintiff $215,965.80 in attorney's fees and costs pursuant to 42 U.S.C. § 1988.[23],[24] She held the department in contempt, and awarded damages to the plaintiff in the amount of $10,837.68.[25]

As to the request for attorney's fees under 42 U.S.C. § 1988,

---

[22]The full transcript of the March 29, 2000, hearing was not filed with the court until June 16, 2003.

[23]The plaintiff filed his motion for attorney's fees and costs on September 14, 2000.

[24]Title 42 U.S.C. § 1988 (2000) authorizes a judge, in her discretion, to award attorney's fees to a prevailing party in civil rights litigation. See *id.* ("In any action or proceeding to enforce a provision of [42 U.S.C. § 1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs"). See also *Mendoza* v. *Licensing Bd. of Fall River*, 444 Mass. 188, 209-212 (2005).

Where, as here, a plaintiff brings an action alleging both Federal constitutional claims under § 1983 and State law claims, "the plaintiff need not obtain a final, favorable determination of his constitutional claims in order to claim an attorney's fee under § 1988. It is enough that the constitutional claims are 'substantial,' and arise from the same nucleus of facts on which the State law claims are based." *Stratos* v. *Department of Pub. Welfare*, 387 Mass. 312, 317 (1982), citing *Maher* v. *Gagne*, 448 U.S. 122, 128 n.10, 132 n.15 (1980). The department does not contest that this standard is met by the plaintiff's claim for injunctive relief.

[25]The judge held the department in contempt for its failure to provide the plaintiff with one-to-one care and a private room by April 30, 2000, and awarded the plaintiff damages based on the cost of a private room from April 30 to June 4 and of one-to-one services from April 30 to June 16. With respect to the plaintiff's ISP itself, the judge found that her March 29, 2000, order did not "specify a deadline" by which the department was required to amend the ISP and that her order therefore could not sustain a finding of contempt to that effect. Although the department had incorporated the private room requirement and the requirement of twenty-five hours of one-to-one care per week into the plaintiff's ISP, the judge found that the department had not used specific language "agreed to by [the department]" in the ISP. The judge therefore ordered the department to incorporate specific language into the

the judge concluded that the plaintiff was a "prevailing party" entitled to fees based on the "catalyst theory" because "the plaintiff vindicated his rights without obtaining court-ordered relief" and "the change in the legal relationship between [the department and the plaintiff] was the product of pressures exerted by the present lawsuit." See *Nadeau* v. *Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978) ("when plaintiff's lawsuit acts as a 'catalyst' in prompting defendants to take action to meet plaintiff's claims, attorney's fees are justified despite the lack of judicial involvement in the result"). The department appealed.

On May 29, 2001, the Supreme Court decided *Buckhannon.* On December 31, 2001, the department moved for reconsideration of the award of attorney's fees to the plaintiff, relying on the holding in that case. After initially declining to rule on the motion because the parties had filed notices of appeal,[26] on March 18, 2002, the judge vacated her award of attorney's fees stating: "Based on the clear language of the [*Buckhannon*] decision, the legal basis for an award of attorney's fees no longer exists." The plaintiff amended his notice of appeal to include an appeal from this order.

2. *Attorney's fees.* We consider first the plaintiff's appeal from the judge's order vacating the award of attorney's fees and costs. In *Buckhannon,* the United States Supreme Court held that for a party to be considered a "prevailing party" under Federal fee-shifting statutes there must be a "material alteration of the legal relationship of the parties," *id.* at 604, quoting *Texas State Teachers Ass'n* v. *Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989), and there must be a "judicial imprimatur

plaintiff's ISP within thirty days.

[26]The judge initially ruled that she was "divested of jurisdiction to act" on the department's motion for reconsideration because notices of appeal had been filed. On February 19, 2002, an assistant attorney general wrote a letter to the judge arguing that the Superior Court retained jurisdiction on posttrial motions as long as the appeal had not yet been docketed in the Appeals Court. See *Garland* v. *Beverly Hosp. Corp.*, 48 Mass. App. Ct. 913, 915 n.5 (1999); *Springfield Redevelopment Auth.* v. *Garcia*, 44 Mass. App. Ct. 432, 435 (1998). See also *Commonwealth* v. *Montgomery*, 53 Mass. App. Ct. 350, 351 n.2 (2001). Thereafter, on March 18, 2002, the judge treated this letter as a motion for reconsideration and issued her ruling on the department's motion because the appeal had not yet been entered in the Appeals Court. The appeal was entered in the Appeals Court on March 31, 2004.

on the change," *Buckhannon, supra* at 605. The Court rejected the "catalyst theory" then used by most Circuit Courts of the United States Court of Appeals. *Id.* See, e.g., *Stanton* v. *Southern Berkshire Regional Sch. Dist.*, 197 F.3d 574, 577 & n.2 (1st Cir. 1999); *Payne* v. *Board of Educ. of Cleveland City Schs.*, 88 F.3d 392, 397-398 (6th Cir. 1996).

The plaintiff now insists that, even under *Buckhannon*, he is a "prevailing party." He focuses on the "judicial imprimatur" aspect of the *Buckhannon* ruling and points to (1) specific statements made by the judge during the February 10 and 17 and March 29, 2000, hearings on his posttrial motion for injunctive relief, and (2) the judge's finding that he is a class member under *Ricci*. See note 11, *supra*.[27]

We review the judge's decision that the plaintiff is not a "prevailing party" de novo. See *Smith* v. *Fitchburg Pub. Sch.*, 401 F.3d 16, 21 (1st Cir. 2005). Accord *Roberson* v. *Giuliani*, 346 F.3d 75, 78 (2d Cir. 2003); *Smyth* v. *Rivero*, 282 F.3d 268, 274 (4th Cir. 2002). Contrast *New England Regional Council of Carpenters* v. *Kinton*, 284 F.3d 9, 30 (1st Cir. 2002) (reviewing

---

[27]The plaintiff also argues that the pretrial December, 1995, "notice of docket entry" and March 1, 1996, order denying his request for a preliminary injunction, see note 8, *supra*, are the "functional equivalent of a consent decree" and, therefore, conferred "prevailing party" status on him at that time. This claim is raised for the first time on appeal and is therefore waived. See, e.g., *Porter* v. *Treasurer & Collector of Taxes of Worcester*, 385 Mass. 335, 338 n.5 (1982), and cases cited. We have reviewed the transcript of the hearing on the motion for attorney's fees and are satisfied the plaintiff did not argue that the 1995 and 1996 actions were the bases of his request for attorney's fees. We have not been provided with copies of any of the plaintiff's memoranda in support of his motion for attorney's fees. On the record before us, we agree with the department that the plaintiff has not previously raised this argument.

The plaintiff further argues that because the judge ordered the department to amend his ISP within thirty days of her December 1, 2000, memorandum and order, see note 25, *supra*, he is a "prevailing party." The order was not clear — the judge initially ordered the department to amend the ISP within twenty days of the entry of her decision, and later in the same order changed that to thirty days. Moreover, according to the judge's findings, the department had already incorporated the private room and one-to-one care requirements into the plaintiff's ISP; the department had simply not used "the specific language agreed to by [the department] and ordered by this Court." We conclude that the December 1, 2000, order did not result in a material alteration of the legal relationship of the parties. See *Buckhannon, supra* at 604-605.

denial of attorney's fees for abuse of discretion where judge construed his own oral order). For the reasons we now explain, we affirm the judge's decision to vacate the award of attorney's fees.

We consider first the "judicial imprimatur" requirement of *Buckhannon*. The Supreme Court stated that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur." *Buckhannon, supra* at 605. The Court then noted that it had "only awarded attorney's fees where the plaintiff has received a judgment on the merits . . . or obtained a court-ordered consent decree." *Id.*, and cases cited. It further noted that attorney's fees had previously not been awarded by the Court where the plaintiff had "secured the reversal of a directed verdict . . . or acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by 'judicial relief' " (citations omitted). *Id.* at 605-606. In the wake of *Buckhannon*, there has been some disagreement among Circuit Courts of the United States Court of Appeals whether a judgment on the merits and a court-ordered consent decree are the only forms of relief that meet the "judicial imprimatur" requirement of *Buckhannon*, or whether these are merely examples of the types of relief that can confer prevailing party status. See, e.g., *Smith* v. *Fitchburg Pub. Schs., supra* at 23 (noting disagreement between Eighth Circuit's narrow reading and more expansive reading of Second, Fourth, and Seventh Circuits). Whatever the ultimate resolution of that question, no court has concluded that oral statements by a judge, sometimes couched in hortatory rather than directive terms, and not reduced to writing, are sufficient to satisfy the requirement of a "judicial imprimatur."[28] To the extent a claim similar to the one the plaintiff makes here has been asserted, it has been

---

[28]In rejecting the "catalyst theory," the *Buckhannon* Court noted that it "spawn[s] a second litigation" requiring "analysis of the defendant's subjective motivations in changing its conduct" (citation omitted). *Buckhannon, supra* at 609. Here, the "second litigation" involves interpretation of the judge's own statements. In such a case the judge herself is "in the best position to determine whether [her] statements . . . should be considered as the functional equivalent of a judicial order within the meaning of *Buckhannon*." *New England Regional Council of Carpenters* v. *Kinton*, 284 F.3d 9, 30 (1st Cir. 2002).

rejected. See, e.g., *New England Regional Council of Carpenters* v. *Kinton, supra* (judge's statements in "extended colloquy" with defendant were not "functional equivalent of a judicial order" where judge entered "no explicit order compelling, or even leading to" change in defendant's behavior).

*Buckhannon* does not preclude an award of attorney's fees on the basis of settlement agreements that are incorporated into a consent decree. See, e.g., *Carbonell* v. *Immigration & Naturalization Serv.*, 429 F.3d 894, 901 (9th Cir. 2005) ("when a court incorporates the terms of a voluntary agreement into an order, that order is stamped with sufficient 'judicial imprimatur' for the litigant to qualify as a prevailing party"); *Truesdell* v. *Philadelphia Hous. Auth.*, 290 F.3d 159, 165 (3d Cir. 2002) (order incorporating terms of settlement reached during preliminary injunction hearing is "proper vehicle for rendering one side a 'prevailing party' "). See also *Rice Servs., Ltd.* v. *United States*, 405 F.3d 1017, 1025-1026 (Fed. Cir. 2005) (same); *T.D.* v. *LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 478-479 (7th Cir. 2003) (same); *Roberson* v. *Giuliani*, 346 F.3d 75, 81-82 (2d Cir. 2003) (same); *American Disability Ass'n* v. *Chmielarz*, 289 F.3d 1315, 1319 (11th Cir. 2002) (same); *Smyth* v. *Rivero*, 282 F.3d 268, 280-282 (4th Cir.), cert. denied, 537 U.S. 825 (2002) (same).

There was no consent decree here. The judge resolved a dispute between the plaintiff and the department by cajoling (and sometimes ordering) the department to reach agreement with the plaintiff about the terms of the plaintiff's ISP and the services the plaintiff should and would receive. It is clear from our careful review of the February 10 and 17 hearing transcripts that the judge ordered the department to produce a new ISP for the plaintiff, but that there was no order from the judge with respect to the specific content of the ISP.[29] That was the focus of the March 29 hearing. By March 29, the department had agreed in substantial measure to provide the plaintiff with a private room, had approved funding for up to twenty-five hours

---

[29]The department acknowledges that the orders were "to speed up the process of producing a final ISP" and notes that the orders "did not prescribe either the contents of the ISP or the provision of services."

of one-to-one care and supervision each week, and had incorporated the provision of one-to-one care into the plaintiff's ISP. Although the department challenged the judge's authority to order the department to provide specific services and include them in the plaintiff's ISP, by then the department's ISP service coordinator and other department officials had already agreed to the relief the plaintiff sought. The judge, therefore, saw no need to grant injunctive relief to the plaintiff. Cf. *Toms* v. *Taft*, 338 F.3d 519, 528-529 (6th Cir. 2003) (although judge was involved in settlement conference, resulting settlement did not bear necessary judicial imprimatur where judge did not issue any order altering defendant's conduct and request for injunctive relief was rendered moot); *T.D.* v. *LaGrange Sch. Dist. No. 102*, *supra* at 478-479 (involvement in settlement negotiations, including conducting settlement conference in chambers and making certain settlement suggestions, not enough for judicial imprimatur). Contrast *Palmetto Props., Inc.* v. *County of DuPage*, 375 F.3d 542, 549-551 (7th Cir. 2004) (upholding award of attorney's fees where court made substantive ruling on motion for summary judgment that ordinance was unconstitutional and county voluntarily "repealed the ordinance only *after* that determination had been made and presumably *because of it*" [emphasis in original]).

This litigation was the catalyst for the department amending the plaintiff's ISP in the wake of the serious injuries he suffered in the department-sponsored group home, and for providing services to the plaintiff, in particular, the one-to-one services that the plaintiff needed. The judge's role in these hearings resulted in the department's amending the plaintiff's ISP to provide one-to-one care and a private room. The ISP was finally drafted to reflect those terms, but no settlement agreement was drafted or executed, and no order incorporating any such terms was entered. Cf. *John T.* v. *Delaware County Intermediate Unit*, 318 F.3d 545, 558 (3d Cir. 2003) (settlement can confer prevailing party status where it is incorporated into court order and where it "[1] contain[s] mandatory language, [2] [is] entitled 'Order,' [3] [bears] the signature of the . . . judge, not the par-

ties' counsel, and [4] provide[s] for judicial enforcement").[30] For all of these reasons we conclude that the requisite "judicial imprimatur" is not present in this case.

Even if the judge's statements at the February and March hearings could be construed to satisfy *Buckhannon*'s judicial imprimatur requirement, it is doubtful that there was a "material alteration of the legal relationship," also required by *Buckhannon*, *supra* at 604. See *Carbonell* v. *Immigration and Naturalization Serv.*, 429 F.3d 894, 900 (9th Cir. 2005), quoting *Richard S.* v. *Department of Developmental Servs. of Cal.*, 317 F.3d 1080, 1087 (9th Cir. 2003) (stipulation for stay of deportation materially altered legal relationship of parties "because the defendants were required to do something directly benefitting the plaintiff[] that they otherwise would not have had to do"). From the commencement of this litigation, the department has acknowledged that it has a statutory obligation to provide appropriate care for the plaintiff, and that the care must be reflected in an ISP, see notes 4 and 6, *supra*. Contrast *T.D.* v. *LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 480 (7th Cir. 2003) (order that school district conduct case-study evaluation to determine plaintiff's eligibility for special education services, which resulted in determination that plaintiff was eligible for such benefits, materially altered legal relationship of parties because school district had not acknowledged plaintiff's eligibility for such services prior to issuance of order). Although the continuing failure of the department to provide appropriate care in the wake of the plaintiff's serious injuries was at the heart of the plaintiff's repeated efforts to obtain injunctive relief, we find nothing in the record to the effect that the department ever

---

[30]In *Preservation Coalition of Erie County* v. *Federal Transit Admin.*, 356 F.3d 444, 448, 451-452 (2d Cir. 2004), on which the plaintiff relies, the court concluded that a plaintiff had attained "prevailing party" status because a judge ordered the defendants to prepare a supplemental environmental impact statement (SEIS), even though the judge declined to issue an injunction. There, unlike this case, the action by the judge in the Federal District Court took the form of a written order in which the judge "ordered" the defendants to prepare the SEIS, as described in the decision, and "to comply" with a series of written requirements. See *Preservation Coalition of Erie County* v. *Federal Transit Admin.*, 129 F. Supp. 2d 551, 577 (W.D.N.Y. 2000). The court further ordered the parties to appear for a hearing "to discuss in detail" the time frame for the various stages implicated by the SEIS. *Id.* at 578.

refused categorically to provide these services. Foot dragging by an agency, however inexcusable, is not refusal.

There is no claim that *Buckhannon* does not apply to this case; the plaintiff concedes the point.[31] We recognize that, throughout the litigation, counsel for the plaintiff were proceeding in good faith under then-existing law, which the judge correctly concluded permitted an award of attorney's fees based on the "catalyst theory." See, e.g., *Nadeau* v. *Helgemoe*, 581 F.2d 275, 279 (1st Cir. 1978). See also *Buckhannon, supra* at 626 n.4 (Ginsburg, J., dissenting) (collecting cases). In the future, counsel who undertake the representation of clients bringing claims under Federal statutes allowing fee shifting will be forewarned that in order to recover attorney's fees, any beneficial arrangements they secure for their clients must be reduced to a written agreement endorsed by a judge. The record in this case is replete with examples of the department and its counsel doing little, if anything, to provide in a timely manner the services to which the department ultimately agreed.[32] While we are not willing to conclude that the department was "being willfully obstructionist," *Smith* v. *Fitchburg Pub. Schs.*, 401 F.3d 16, 27 (1st Cir. 2005), the time and resources expended by plaintiff's counsel and the judge in obtaining an agreement by the department to provide essential services was greater than necessary.

We now address the plaintiff's claim that the judge's ruling that he is a *Ricci* class member is a sufficient basis under *Buckhannon* to confer "prevailing party" status on him.[33] A finding of fact, unaccompanied by a conclusion of law, will usually not

[31]The *Buckhannon* rule "must be given full retroactive effect in all cases still open on direct review." *Toms* v. *Taft*, 338 F.3d 519, 530 (6th Cir. 2003), quoting *Harper* v. *Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993).

[32]On appeal the Department of Mental Retardation was represented by the Attorney General.

[33]The department claims that the judge's finding that the plaintiff is a *Ricci* class member is clearly erroneous. At an early stage of the *Ricci* proceedings, the judge stated that "a 'class member' is defined as any person residing at or on the residential rolls of one of the [State] institutions . . . on or after the following dates: Belchertown, 2/2/72." *Ricci* v. *Callahan*, 646 F. Supp. 378, 380 n.2 (D. Mass. 1986). The record reveals that the plaintiff resided in the State institution at Belchertown until May 8, 1967, and was therefore not a class member under this formulation. The 1993 *Ricci* v. *Okin* decision, however, also defined class membership to include "the individuals who have

work a material alteration of the legal relationship of the parties. Here, the finding by the judge that the plaintiff is a *Ricci* class member may have clarified the legal relationship between the plaintiff and the department; it did not *change* the relationship, which had been determined years earlier in the *Ricci* litigation itself.[34] See note 11, *supra.* See also *Buckhannon, supra* at 613-615 (Scalia, J., concurring) ("prevailing party" status requires "judicial finding" of "the merits of the plaintiff's case" or "of liability").[35] The plaintiff either is or is not a *Ricci*

been identified in the Class Member Identification List issued as of April 30, 1993, regardless of their current place of residence." *Ricci* v. *Okin,* 823 F. Supp. 984, 986 n.1 (D. Mass. 1993). The plaintiff claims he was identified in the class member identification list because his file with the department includes a "legal notice" informing him that he is a plaintiff class member in *Ricci* v. *Okin, supra,* and that he is entitled to rights and services guaranteed by the 1993 order in that case.

It does not appear that the judge had before her evidence that the plaintiff resided in the Belchertown State institution only until 1967. That evidence was presented to a different judge in 1995. See note 8, *supra.* She did, however, have a copy of the "legal notice" naming the plaintiff as a *Ricci* class member. A copy of the class member identification list does not appear in the record. In light of the conflicting evidence we cannot conclude that the judge's finding was clearly erroneous.

[34]As required by *Ricci* and the department's current regulations, if the plaintiff's name appears on the class member identification list, he qualifies for "special eligibility" for the department's services. See 115 Code Mass. Regs. § 6.05(1) (2003). "Special eligibility" entitles clients to the same services as clients with "general eligibility," with two exceptions. First, persons with "special eligibility" are entitled to "the least restrictive, most typical, appropriate residential environment, together with the most appropriate treatment, training and support services suited to that person's individual needs." *Ricci* v. *Okin, supra* at 987 n.2. See 115 Code Mass. Regs. § 6.05(2)(e) (2003). Second, persons with "special eligibility" receive priority if the department lacks resources to provide services to all of its clients. See 115 Code Mass. Regs. § 6.07(1)(a) (2003) ("Except as to individuals who have special eligibility pursuant to 115 [Code Mass. Regs. §] 6.05, all supports, including assessments, planning and development and implementation of Individual Service Plans, are subject to the availability of resources").

[35]The plaintiff's reliance on cases outside the *Buckhannon* context is inapposite. See *Sumner* v. *Mata,* 449 U.S. 539, 549 (1981) (in habeas corpus context, requirement imposed by Fed. R. Civ. P. 52 on Federal District Court following bench trial to "find the facts specially and state separately its conclusions of law thereon" "undoubtedly makes a judge more aware that it is his own imprimatur that is placed on the findings of fact and conclusions of law"); *Herrick* v. *Garvey,* 298 F.3d 1184, 1192 (10th Cir. 2002) (describing findings of facts by judges as having "imprimatur that has been stamped upon them by the judicial system" that leads juries to give disproportionate weight

class member; there is no judicial imprimatur that changed the legal relationship of the parties.

3. *Contempt*. On March 29, 2000, the judge held a hearing on the plaintiff's motion for injunctive relief to obtain certain services from the department. On appeal, the department argues that the judge abused her discretion in later finding the department in contempt of an order the judge concluded she had issued orally at that hearing, namely, to provide one-to-one care and a private room to the plaintiff by April 30, 2000. There is no dispute that the plaintiff was not in a private room and was not receiving one-to-one services by April 30. But the hearing at which the judge ostensibly issued the order in fact contains no order on the subject. The judge's conclusion that she had issued such an order, a conclusion she reached some six months later without the benefit of the transcript of the March 29 hearing, is clearly erroneous in light of the transcript that is now before us. As a result, the judge's finding that the department was in contempt must be reversed.

To hold a party in contempt, "there must be a clear and unequivocal command and an equally clear and undoubted disobedience." *Nickerson* v. *Dowd*, 342 Mass. 462, 464 (1961). Oral orders may, of course, support a contempt finding. Cf. *Dominick* v. *Dominick*, 18 Mass. App. Ct. 85, 88-89 (1984) (oral agreement read into record binding on parties). But whether in written or oral form, we determine whether a party is in contempt by looking to the precise words of the order itself. Where the order is oral, we look to the words of the transcript.

In this case, the plaintiff's complaint for contempt alleged that the department had failed to comply with two orders that he claimed the judge had issued orally on March 29: (1) that the department make specific changes in the wording of the plaintiff's ISP, and (2) that certain components of that revised ISP (placement of the plaintiff in a private room and the provision of one-to-one services for approximately twenty-five hours each week) be implemented by April 30, 2000. In her December 1, 2000, memorandum and order on contempt, the judge found that, although she had ordered on March 29 that changes

to such findings of fact if admitted in evidence).

be made in the ISP document, she had not set any deadline for the making of those changes. She therefore concluded that the department could not be held in contempt on that ground. She found contempt solely on the second ground, concluding that on March 29 she had issued an oral order that services be in place by April 30 and that the department had failed to provide the services by that date. The issue, then, is not whether the judge issued some form of "order" at the March 29 hearing, but whether any such order included a "clear and unequivocal command" setting an April 30 deadline for the implementation of services.

The transcript of the March 29 hearing, which (as we have noted) was not available to the judge before she issued her ruling on contempt, contains nothing resembling an order that the department implement specific services by April 30. That date was contained in the ISP prepared by the department; the transcript reflects only the judge's inquiries as to the funding status that would make April 30 a feasible date for implementation. The department's answer to the judge was that while the ISP service coordinator had put the April 30 date in the ISP and understood that funding had been approved, the service coordinator did not know enough about the details of the funding mechanism to say for certain whether the April 30 date would in fact be met. See note 21, *supra*. Beyond this colloquy between the judge and the ISP service coordinator, the subject of the April 30 date, and the subject of the funding that would make the April 30 date achievable, did not come up again at any time throughout the remainder of the March 29 hearing. Instead, the judge turned her attention to resolving the two components of the ISP with which plaintiff's counsel remained dissatisfied: the placement of the plaintiff in a private room, and the provision of one-to-one services. After a colloquy between the judge and the department on the one hand, and the judge and the plaintiff on the other, the department confirmed that the service coordinator had agreed to amend the ISP to provide those services, the plaintiff said that this was satisfactory, and the judge expressed the view that the parties had now "dealt with the ISP."

The judge next addressed how the plaintiff's pending motion

for injunctive relief should be resolved, observing that "with the current ISP, you [the plaintiff] really don't need me to do anything." Plaintiff's counsel agreed, but asked that the judge make certain findings about the plaintiff's entitlement to the rights of a *Ricci* class member and the corresponding right to services under his ISP and the regulations. The judge responded by asking plaintiff's counsel to submit to her proposed findings of fact. Plaintiff's counsel then requested that his motion for injunctive relief be denied as "moot," as opposed to simply being denied. The judge agreed to do so, clarifying that the denial of the plaintiff's motion for injunctive relief as moot was without prejudice to his request for attorney's fees.

From this review of the transcript of the March 29 hearing, it does not appear that the judge ever ordered anything. She sidestepped the department's legal objections to her authority to issue an order modifying the ISP by indicating that she was merely "asking" the department to do what the department had, on its own, already "agreed to." To the extent there was any ambiguity in such terminology, the ultimate resolution of the hearing was that the plaintiff's request for an injunction was denied as moot. What had rendered the motion moot was the department's submission of an ISP and an agreement to make two modifications to the wording of that ISP. At most, the judge had exerted pressure on the department to prevent it from backing off its prior agreement with respect to those two modifications.

Even if one were to interpret this transcript as ordering the department to make the two amendments to the ISP (a point we need not decide, as the department was not found in contempt of that aspect of the ostensible "order"),[36] the transcript contains no order that particular services be implemented by the April 30 date. As noted earlier, the transcript reflects only the judge's

---

[36]The department apparently did understand that some order had issued because it moved for reconsideration of the March 29 "order." The department's motion addressed the judge's ostensible order that the department amend the ISP to include provision of a private room and one-to-one services for the plaintiff, but made no reference to the judge's having ordered a particular implementation date. Just as the record contains no order that services be implemented by April 30, it contains no admission from the department that the order included such a term.

inquiries as to the funding status that would make that date feasible. In short, the plaintiff never sought, and the judge never issued, any order that the provisions in the ISP (either the original provisions or the amended provisions) be implemented by any particular date.

The burden of proving contempt is, of course, on the plaintiff. *United States Time Corp.* v. *G.E.M. of Boston, Inc.*, 345 Mass. 279, 282 (1963). In the case of a disputed oral order, this makes it incumbent on the plaintiff to obtain the transcript and prove the contents of the order. Here, the judge herself recognized that she needed the transcript to determine precisely what she had and had not ordered some six months earlier: during the contempt hearing, she ordered the court reporter to prepare a transcript of the March 29 hearing for that purpose. The department cannot be penalized with contempt when it was a court reporter who flouted the judge's order for an immediate transcript. What is clear from the contempt hearing is that the department did not understand that the judge had imposed an obligation on it to provide one-to-one services and a private room for the plaintiff by April 30, 2000.[37]

That the department is not in contempt does not suggest that it is blameless in this affair. To the contrary, the department was under a legal obligation, even without a court order, to make good faith efforts to achieve the objectives set forth in its own

---

[37]The plaintiff points to the ISP service coordinator's electronic mail message (e-mail) as evidence that the department understood that the judge had entered that order. In her testimony at the contempt hearing, the ISP service coordinator confirmed that the first sentence of the e-mail in question reflects that "[t]he start date [the ISP service coordinator] gave the [c]ourt was April 30th." That is an accurate reflection of what is contained in the transcript of the March 29 hearing, where the coordinator indicated to the judge that she had put the April 30 date in the ISP and explained her expectation, but not certainty, that the funding would be in place by that time. In another question posed to the ISP service coordinator at the contempt hearing, the plaintiff's counsel, referring to the same e-mail, asked her if it reflected that she, the service coordinator, gave "the deadline for providing services to [the plaintiff] as April 30th." She answered in the affirmative. This does not, by itself, indicate that any "deadline" was imposed by the judge. The e-mail establishes nothing more than what the transcript of the March 29 hearing establishes, i.e., that the ISP service coordinator made certain representations to the judge at the March 29 hearing about the April 30 date that was already set in the ISP.

ISP, and it failed to do so. And, after the department provided the ISP containing the April 30 date to the plaintiff's counsel, counsel relied on that date in effectively withdrawing his request for injunctive relief. The department's failure to provide services by the date given to counsel in the ISP and at the hearing is in essence a breach of an agreement with the plaintiff. Finally, having made representations to the judge to the effect that, if funding were in place, the services would be provided by April 30, the department failed to honor that representation. These are serious forms of misconduct, but in the absence of an express court order, this misconduct cannot be elevated to a contempt of court. We therefore reverse that portion of the judge's order holding the department in contempt and awarding damages to the plaintiff.

*So ordered.*